EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

| | |
|---|---|
| * * * * * * * * * * * * | * CRIMINAL ACTION |
| USA | * 06-116 |
| | * |
| VS. | * JUNE 1, 2007 |
| | * |
| JOHN KIMBROUGH | * PROVIDENCE, RI |
| * * * * * * * * * * * * | * |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(SENTENCING)

APPEARANCES:

| | |
|---|---|
| FOR THE GOVERNMENT: | LEE VILKER, ESQ.<br>U.S. Attorney's Office<br>50 Kennedy Plaza<br>Providence, RI 02903 |
| FOR THE DEFENDANT: | EDWARD C. ROY, JR., ESQ.<br>Federal Defender's Office<br>10 Weybosset St.<br>Suite 300<br>Providence, RI 02903 |
| Court Reporter: | Anne M. Clayton, RPR<br>One Exchange Terrace<br>Providence, RI 02903 |

Proceeding reported and produced by computer-aided stenography

THE COURT: Good morning, everyone. This is the matter of the United States versus Kimbrough. We're here for sentencing this morning.

Let's begin by having counsel identify themselves for the record, please.

MR. VILKER: Good morning, your Honor. Lee Vilker, Assistant U.S. Attorney, for the Government.

MR. ROY: Good morning, your Honor. Edward C. Roy, Assistant Federal Public Defender, for the defendant, John Kimbrough.

THE COURT: Thank you. Mr. Roy, if you can confirm you've had the opportunity to review the presentence report with Mr. Kimbrough. I realize that he has some literacy issues so I'd like to just be sure that you either read it to him or had it read to him.

MR. ROY: Yes, your Honor. We actually met on two occasions to make sure he understood all of the PSR. So I met with him twice to go over the PSR, and I believe he understands what's contained in the document.

THE COURT: Thank you. All right. Then are there any objections to the presentence report, or any issues that require discussion or taking of any evidence this morning prior to sentencing for either the Government or the defendant?

MR. VILKER: I don't believe so, your Honor.

MR. ROY: There's nothing on behalf of the defendant, your Honor.

THE COURT: All right. Then I'll accept the presentence report as it is currently drafted, and I'll outline now on the record the advisory guideline range as calculated by the presentence report.

In this case, the base offense level on Count I is a 30. On Count II, the base offense level is a 24. The combined offense level, however, results in a 31 as set forth in Paragraph 29. The defendant is a career offender and so under Section 4B1.1, because the statutory maximum in this case is over 25 years, his offense level is adjusted upward to a 34.

He receives a three-point reduction for acceptance of responsibility, yielding a total offense level of 31. The defendant's criminal history places him in 11 criminal history points, plus two points added because he committed the instant offense while on a criminal justice sentence, he was on probation. So he has a total of 13 criminal history points and that places him in a category 6.

So as a result of all of this, the defendant's guideline range in this case is 188 months to 235 months.

I would just note for the record that originally the Government filed a motion to have the defendant designated as an armed career offender under Section 924(e), that motion was later dismissed by the Government. So he is not designated as an armed career offender.

So that is the advisory guideline range in this case. There are no motions for departure, I take it, so we can move directly to hearing from the parties with respect to the appropriate sentence in this case.

So Mr. Vilker?

Did the Government file a sentencing memorandum in this case? I didn't see one on the docket.

MR. VILKER: We did not, your Honor. The Government is recommending a sentence at the bottom of the guideline range in this case, which would be 188 months. We believe that sentence is sufficient and needed to punish the conduct and to prevent further criminal conduct by the defendant but don't believe any higher sentence within that range is necessary.

This defendant already has, prior to this instant offense, three very serious offenses, a 1991 conviction for delivery of a controlled substance for which he received eight years in prison with 18 months to serve. Apparently, as soon as he was released from

that he was found to be in possession of a firearm and had a federal possession of a firearm by a convicted felon possession, which he received 92 months. Shortly after he was released from that sentence, he was arrested and convicted, again, on trafficking and drugs. He was violated federally and got 24 months violation federally and got an additional 18 months to serve in the state, and then he was released from that and a year or two later, I believe, he committed the instant offense, which, again, deals with trafficking in drugs and firearms.

I don't think there's any question based on this history that the defendant poses a danger to the community, trafficking in drugs and guns. And based on his history, it's the Government's view there's a high likelihood of recidivism once the defendant's released.

So based on these circumstances, the Government is recommending a sentence of 188 months. I received Mr. Roy's memorandum, and I don't think there's any question, the Government's not disputing that there are significant learning disabilities and cognitive deficits. And I think it's clear to everyone. And while I guess on one level that those are mitigating factors and the Government would recognize that, on the other hand, it seems to even add to the likelihood of

recidivism in terms of what kind of job or how the defendant is going to function back in society once he is released. I guess that's all I have to say on that.

The bottom line, we believe that the bottom of the range, which is 188 months, is appropriate in this case.

THE COURT: Thank you, Mr. Vilker. Mr. Roy?

MR. ROY: Thank you, your Honor. I would note at the outset, your Honor, that one of the counts in this case does involve crack cocaine. The amount in this case is 49.9 grams, which is not a lot of cocaine base. It's a significant amount, but it's not a real lot. That I think is something the Court should consider as the Court I know has considered in other cases.

When I look at this defendant, your Honor, Mr. Vilker's remarks about his record are true and the Court has mentioned that he has 13 criminal history points. All of that is true. What I think really is important is to look at the evaluation that was performed at our request by Dr. Tremont. And I had that done, your Honor, because when I talked to Mr. Kimbrough about his background and about what was going on with him, the issues that Mr. Vilker brought up jump out at me, also. And I was concerned about

what was going to happen with this defendant for the rest of his life.

He's at an age now where he's either going to do the rest of his life in jail or have a chance to be a productive member of society.

And when I spoke to Mr. Kimbrough about what had happened to him when he was incarcerated and during the various stints he's had in jail, he told me that he never had a comprehensive evaluation like this done either in the BOP. I looked at his prior PSR for the gun charge and it didn't appear anything in that PSR reflected that he had had this type of a comprehensive evaluation.

And Dr. Tremont, at my request, spent a lot of time with Mr. Kimbrough, four separate sessions. One for social history and three different testing sessions so he could really get an accurate grip on what was going on with this defendant. And given this defendant's constellation of problems, your Honor, the likelihood of recidivism does increase dramatically without proper treatment. And I think that the fact that he's here today is living proof of that. But I think what we want to look at is the future. Does the defendant have a future, or are we going to warehouse him for the rest of his life.

I'm asking the Court to impose a sentence at the mandatory minimum of ten years. And the reason for that is this defendant in my view, your Honor, has never really had the proper treatment given the conditions that have been listed in Dr. Tremont's report. He's been warehoused and warehousing simply doesn't work for a defendant like Mr. Kimbrough, your Honor.

A sentence of ten years would allow him, if he receives the proper treatment that's indicated for the problems he has, vocational treatment as well as treatment for the depression that he suffers, he'll at least have a shot of becoming a productive member of society. If he gets a ten-year sentence, he'll serve eight and a half, nine years of that. He'll be in his late 40's, and should, at that point in time, be much, much less likely to be committing crimes of this nature.

THE COURT: How do we account for the fact that this defendant received a 92-month sentence in the federal system in 1993, which he then served, then violated, served two more years? So when you add that up, he really served almost the amount of time that you're requesting in the sentence for this offense. And yet, that sentence seems to have had no effect on

him, and it was in the federal system.

So presumably, the defendant had access to the programs that are available in the federal system during that sentence.

How do I -- how does the sentence that you're requesting reflect the kind of increasing ratchet, if you will, which is responsive to the fact that he seemed to not get the message the last time?

MR. ROY: As the Court is aware -- I anticipated the Court asking that. As the Court is aware, the PSR does track a defendant in the federal system. One of the things I mentioned in my sentencing memo is that whatever the outcome of today's sentencing is, I want the Court to attach or send a copy of Dr. Tremont's evaluation to the BOP citing warehousing. Without specialized opportunities for a defendant with this limited cognitive ability is only warehousing. And the fact that he got out and got in trouble, Judge, is indicative that the mere warehousing without proper treatment doesn't work particularly for a defendant like this.

He's going to get involved in this kind of street level drug action, if you will, Judge, to make an extra 50 or 100 bucks. That's all this is. He was a pure mule, your Honor. He wasn't a guy that was a

player or was driving a Lexus or anything like that. He was a guy that was trying to make an extra hundred bucks for diapers for his baby out of these kind of transactions, and he happened to get involved with an informant that was being paid on a per body basis by the ATF.

And I'm not trying to justify what he did, but if you can't make ends meet, that hundred dollars that you're looking at for moving a couple ounces of crack looks awful good to a defendant like Mr. Kimbrough.

And I understand the Government's comments in this regard. But I think what's different now, your Honor, with this defendant, there's an awful cost in warehousing someone for 15 years. Society is better off if we can give him a lower sentence with a better chance to do something.

And I think that this defendant hasn't really had a shot, Judge. As I look at his record, prior incarcerations at the ACI don't do anything for a defendant like this. A BOP sentence without a diagnosis of what's going on with the defendant doesn't really help. I think the fact that we're here today shows that.

So while it seems like the request I'm making is irrational, your Honor, I think that if the BOP is made

aware of what this defendant has for problems and evaluates him and puts him in programs that will allow him to achieve the best he can achieve, there's a much better chance of this defendant not getting out and being involved in these kind of problems again.

THE COURT: I agree with you, that the report by Dr. Tremont is a very -- I thought it was very well done. I read the whole thing. And I'm in agreement with your recommendation to attach this to the presentence report and have it submitted to the Bureau of Prisons. I will do that, and I hope they'll pay attention to the contents of the report.

I don't know whether it will result in any meaningful treatment or training or education for the defendant. I don't even know if the Bureau of Prisons is really set up to deal with these kinds of cognitive and learning disability problems. They have a lot of programs, but I'm not sure that, as Dr. Tremont points out, achievement of a GED, which is one thing you can do in the BOP system, doesn't seem very likely. He's in need of really remedial help. And maybe the BOP is set up to do that. I just don't know.

I guess I haven't seen too many defendants who are sort of borderline as Mr. Kimbrough is, as indicated by this report. But I'm happy to do that. I

just -- I'm a little frustrated by this case because I'm in agreement with a lot of what you're saying about what the needs of the defendant are, but on the other hand, it's almost like that is totally separate from what the sentencing calculation is and should be in terms of his history.

MR. ROY: My response to that, your Honor, would be if you look at what Section 3553(a) says, that the court shall provide a sentence that is sufficient but not greater than necessary, I think the ten-year sentence I've asked for, given the possibility, at least, that Mr. Kimbrough will get remedial treatment, that that sentence is sufficient but not greater than necessary to accomplish all the goals. Ten years is a long time, Judge.

THE COURT: I suppose I could, just hypothetically, give him a consecutive term of supervised release, or does the supervised release on Count II have to run concurrent?

PROBATION OFFICER: It has to, yes.

THE COURT: So five years is maximum?

PROBATION OFFICER: Yes.

THE COURT: Okay.

MR. ROY: Unless the Court has any further questions, that's all I have. Thank you.

THE COURT: Thank you, Mr. Roy.

Mr. Vilker, would you like to respond?

MR. VILKER: The only one minor correction I wanted to make is the mandatory minimum is five years. It's more than five grams of crack cocaine, not more than 50 grams. I wanted your Honor to know that for making the sentencing determination.

THE COURT: Right. Thank you.

Mr. Kimbrough, would you like to say anything?

THE DEFENDANT: Yes, sir. Your Honor, I just like to apologize for what I've done to the community. Also my family. Sandra and my daughter back there. That gave me a chance to make a change and was helping me to change because I explained to you before I never really trusted anyone because of my learning disability. So it was very hard for me to let her get close to me or anybody else get close to me. Probably why I turned to the streets, you know. But I do know that if I have a chance, which I do now, to change -- I'm too old now. I have two grandchildren that I seen once in my life since I've been out. My mother, who's 83 years old now, I don't know if I'm going to ever get a chance to ever see her again, but I know that she's blessed. And I just -- I'm tired. This is not the life that I want. Not being able to see my children

grow up, become something or just being there to hold them and, you know, it hurts. It hurts a lot. Whether you believe me or not, but I'm just tired, you know. And it stops here. I'm really tired. I just want to be able to have my strength and be able to go home and give back to the community and society, you know, whether it be a job making $3 a day, doesn't matter. What matters is that I'm there with my family. That's what counts to me, you know.

So I mean, I'm the one has to make that change. No one can make that change for me. It's me, you know. And I want to change because of my children and the people that does love me, you know what I mean, and that's Sandra. You know, she's been here from day one when I felt all my life I would never amount to nothing. That's the way I felt. Even going through school, I felt that way. I'm not going to amount to nothing. Nobody really cared. So that made me feel bad, made me feel guilty. You know, it made me just not care. But I know better now. I know that somebody does care, you know. I care for myself, too. This is not the life that I want, you know. Somebody has to change somewhere, somehow. I'm almost 40 years old. It has to stop here, you know.

I'm just tired, your Honor. I really am. I'm

tired. I can't do this anymore. I'm tired of being away from my loved ones. Seeing my mother since 1986 when my sister passed. That's ridiculous. I never got a chance to go back home. Because why? My day in the streets, thinking that's what it's about, the streets, and it's not. It's about me being able to support my family by any means necessary, and that means just giving them love, even if I don't have a penny in my pocket.

That's all I have to say, your Honor. Sorry to take up you all's time today. I'm really tired. I really am.

THE COURT: All right. Thank you.

Well, as I indicated when I was speaking to Mr. Roy, I have a lot of agreement with some of the points that he's making about the warehousing of a defendant, and I think that in some respects these sentences, sentencing ranges are more than they should be for offenses like this. But on the other hand, this case did involve a firearm, and you have a history of involvement, not just with the drugs, but also with the firearm, and that's disturbing.

Some of your history indicates that you actually used the firearm. The conviction for which you were sentenced to 92 months, for example, the description

indicates that the firearm was discharged. So this is an extremely dangerous combination. And the problem I see in looking at your presentence report is that you continue to go back to this lifestyle.

Now, you're saying that you won't. You're saying that you're tired of it, and you don't want to live this life anymore, but the history indicates that you do return to this lifestyle. And I'm not saying that you're being dishonest, and I'm not saying that I don't believe you. I'm just saying I have to balance these things out.

So it's important that in sentencing you that you get the message that sentences are going to become increasingly severe as you return to this lifestyle.

And not just -- I don't want you to sort of get the impression that you can come in here and say, well, that's the last time I'm going to do it and I won't do anymore so don't give me a big sentence. That's not the way it works.

I can believe you and I can hope you're telling the truth, but I have to be respectful of the way the system works. And I have to consider a sentence that will deter you from doing this in the future, and it will deter other people from doing this in the future and that will protect the public from you and people

like you who choose to do this kind of stuff, getting out there and dealing drugs and firearms out on the street. Those are all the things that go into figuring out what an appropriate sentence is.

So while I am in agreement with much of what Mr. Roy says, and I'm going to attach this report by Dr. Tremont to the presentence report that's submitted to the Bureau of Prisons, and I'm hopeful that you're going to get some of the educational assistance that I think you need in order to hold down a job when you get out of prison, I'm going to do all of that, but the sentence has to reflect to some degree the seriousness of the offense and has to respond to these other factors that I spoke about.

So the sentence is as follows: Mr. Kimbrough, I'm remanding you to the custody of the Bureau of Prisons for a period of 150 months on Count I, 120 months on Count II to run concurrent, meaning at the same time. I'm imposing a term of supervised release of five years. You'll also be required to pay the special assessment of $200. There'll be no fine. There's no restitution.

As a special condition of your supervised release, I'm going to require that you participate in a program, either inpatient or outpatient program for

substance abuse treatment, which may include periodic testing up to 72 drug tests per year.

Let me ask Probation something. Come up here.

(Discussion off the record.)

THE COURT: All right. I believe the defendant waived his appeal rights in the plea agreement if the sentence was at or below the guideline range; is that correct?

MR. VILKER: Let me just double check that, your Honor.

THE COURT: Paragraph 11.

MR. VILKER: That's correct, your Honor.

THE COURT: All right. Then finally, although I think I've already stated this, I'm going to attach Dr. Tremont's report to the presentence report.

I'm going to recommend that the Bureau of Prisons place you in a facility that is suitable and will allow you to get some of the -- hopefully, some treatment or assistance with respect to some of the learning disability issues that you have, because it's my firm belief that your ability to stay out of this kind of a lifestyle when you get out of prison is going to be tied directly to your ability to hold down a job when you get out.

So the best thing that we in the criminal

justice system can do for you is to see to it that in the 10 plus, or 13, whatever it is, 12, 13 years that you're going to spend incarcerated, that you learn how to read and write. And until you learn how to read and write, you're going to have a very hard time holding down any job.

So I'm hopeful that, if the Bureau of Prisons can do anything for you besides substance abuse treatment, can get you into a program that will develop some literacy for you, but you're going to have to work at it, too. So that's the bottom line. So I'm giving you somewhat of the break that you're asking for. Not as much as you want, but, you know, you said it yourself, you're almost 40 years old. You're going to be well over 50 years old when you get out of prison. And, you know, if you go back to this lifestyle, then the next sentence is going to be the life sentence, because, you know, the judge may not say life imprisonment , but it will be a life sentence for you. It will be the rest of your life. So hopefully, you mean what you say.

THE DEFENDANT: I do.

THE COURT: But if you don't, it will be your last chance. So I'm going to try to give you an opportunity in your 50's to go in the right direction.

I hope you do it.

All right. Is there anything further?

MR. VILKER: No, your Honor. Thank you.

MR. ROY: No, your Honor.

THE COURT: Okay. We'll be in recess.

(Court concluded at 9:40 a.m.)

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Anne M. Clayton

Anne M. Clayton, RPR

April 1, 2008

Date